NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 200483-U

NO. 4-20-0483

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 19, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* I.A., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Livingston County |
| Petitioner-Appellee, | ) | No. 18JA21 |
| v. | ) | |
| Tosha H., | ) | Honorable |
| Respondent-Appellant). | ) | Jennifer H. Bauknecht, |
| | ) | Judge Presiding. |
| | ) | |
| | ) | |

JUSTICE HARRIS delivered the judgment of the court.
Justices Holder White and Steigmann concurred in the judgment.

**ORDER**

¶ 1   *Held*:  The trial court did not err in finding respondent unfit to parent her minor child or in terminating respondent's parental rights.

¶ 2        On June 30, 2020, the trial court found respondent, Tosha H., unfit to parent her minor child, I.A. (born June 27, 2018). On August 25, 2020, the court terminated respondent's parental rights. Respondent appeals, arguing the trial court erred both in finding that she was an unfit person and in finding termination of her parental rights was in the best interest of I.A. We affirm.

¶ 3                              I. BACKGROUND

¶ 4        On July 25, 2018, the State filed a petition for wardship, alleging I.A. was neglected

under the Juvenile Court Act of 1987 (705 ILCS 405/2-3 (West 2016)). In the first three counts of the petition, the State alleged I.A. was neglected in that her environment was injurious to her welfare (*id.* § 2-3(1)(b)) because (1) respondent and Jeffrey Arnold, I.A.'s father, had substance abuse issues which prevented them from properly parenting I.A., (2) I.A. had access to illegal substances and other harmful materials, and (3) respondent failed to correct the conditions that led to the removal of I.A.'s siblings from her care. The State additionally alleged I.A. was neglected because, at birth, her blood, urine, or meconium contained a controlled substance (*id.* § 2-3(1)(c)). That same day, the trial court conducted a shelter care hearing and entered an order granting the Department of Children and Family Services (DCFS) temporary custody of I.A.

¶ 5        On August 16, 2018, the Center for Youth and Family Solutions (CYFS), an agency operating under contract with DCFS, implemented a family service plan. Under the plan, respondent was required to, among other things, complete an integrated assessment, cooperate with DCFS and CYFS to complete necessary services, complete a substance abuse assessment, stop using "alcohol, illegal drugs[,] and non-prescribed medication," and participate in weekly visits with I.A.

¶ 6        On October 24, 2018, the trial court entered an adjudicatory order finding I.A. was neglected as a result of respondent's and Arnold's substance abuse issues (*id.* § 2-3(1)(b)) and because at birth, I.A.'s blood, urine, or meconium contained opioids (*id.* § 2-3(1)(c)). A month later, the court entered a dispositional order finding respondent unfit to parent I.A., making I.A. a ward of the court, and granting custody and guardianship of I.A. to DCFS. The court additionally ordered that respondent comply with the requirements of DCFS, CYFS, and the service plan.

¶ 7        On September 26, 2019, the State filed a petition to terminate respondent's parental

rights. (We note the State also sought to terminate the parental rights of Arnold and that, ultimately, his parental rights were terminated; however, he is not a party to this appeal, and we discuss the facts only as they relate to respondent.) In the petition, the State alleged respondent was an unfit person in that she failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to I.A.'s welfare (750 ILCS 50/1(D)(b) (West 2018)); (2) protect I.A. from conditions within her environment injurious to her welfare (*id.* § 50/1(D)(g)); (3) make reasonable efforts to correct the conditions that were the basis for I.A.'s removal (*id.* § 50/1(D)(m)(i)); and (4) make reasonable progress toward the return of I.A. during the nine-month period from October 24, 2018, to July 24, 2019, and the period from December 17, 2018, to September 17, 2019 (*id.* § 50/1(D)(m)(ii)).

¶ 8          On January 28, 2020, the trial court conducted a fitness hearing. At the hearing, the State first presented testimony from Officer Brian Enderli of the Pontiac Police Department. According to Officer Enderli, on July 23, 2018, he responded to a call regarding a possible overdose at respondent's apartment. When he arrived at the apartment, he found Arnold unconscious in the bedroom he shared with respondent and I.A. In the bedroom where he found Arnold, Officer Enderli also discovered, among other things, a syringe cap, a spoon that "had burn marks on the bottom side of it," several "brownish-red capsules," and a dinner plate with "white residue" on it, all of which indicated to Officer Enderli that Arnold had overdosed on heroin. Several of the items Officer Enderli found were located on a dresser next to I.A.'s crib and were surrounded by I.A.'s "baby care items." Although respondent was in the apartment when Officer Enderli arrived, he did not see her or I.A. in the bedroom with Arnold, and respondent did not appear under the influence of drugs.

¶ 9          The State next called Brittany Barth, a CYFS foster care family worker who, until

March 2019, served as I.A.'s caseworker. Barth testified that, after I.A. was removed from respondent, respondent had returned to live with her parents in Missouri. Barth explained, because respondent lived outside of Illinois, she was unable to schedule random drug screenings for respondent or to refer respondent for individual counseling. Barth further testified respondent was uncooperative and uncommunicative with CYFS and, by the time Barth stopped working as I.A.'s caseworker, had not started any substance abuse treatment. According to Barth, even though CYFS purchased train tickets and made hotel reservations for respondent to attend visits with I.A., respondent failed to attend these visits "very frequently," usually without providing a reason. When respondent did attend visits, she was "engaged with [I.A.]."

¶ 10       Finally, the State called Kaitlynn Stigall, who became I.A.'s caseworker in April 2019. Stigall testified, since she became involved in I.A.'s case, respondent had started substance abuse counseling but she attended so infrequently that, in July 2019, her counselor warned that she would be unsuccessfully discharged if she continued to miss appointments. In October 2019, she stopped attending substance abuse counseling altogether and was ultimately discharged from the treatment program. Stigall further testified that, in April 2019, respondent completed three drug screenings, all of which came back negative. However, respondent refused to complete other drug screenings that were required by CYFS and by her substance abuse counseling program, and in June and July 2019, she tested positive for fentanyl and opiates. Stigall also testified respondent had not begun individual counseling, which had been recommended following respondent's integrated assessment, and had attended few of her scheduled visits with I.A. When respondent did appear for visits, I.A. was "very upset." During her visits with respondent, I.A. cried, "wanted to stay with the foster mom," and showed no signs that "she was bonded in any way to

- 4 -

[respondent]." Following her visits with respondent, I.A. showed "regression signs." Respondent did not attend any visits with I.A. after August 26, 2019.

¶ 11    At the end of the fitness hearing, the trial court found respondent unfit based on each ground alleged by the State.

¶ 12    In August 2020, CYFS filed a best interest report. In the report, the agency indicated respondent had not participated in required services since October 2019 and had not visited with I.A. since August 2019. The agency further indicated I.A. was "happy, healthy, and thriving in her current placement" and concluded it was "in the best interest of [I.A.]" that respondent's parental rights be terminated.

¶ 13    On August 25, 2020, the trial court conducted a best interest hearing. At the beginning of the hearing, the court admitted the best interest report filed by CYFS and agreed to take judicial notice of the evidence from the fitness hearing. No other evidence was presented. After argument, the court found termination of respondent's parental rights was in I.A.'s best interest.

¶ 14    This appeal followed.

¶ 15                                  II. ANALYSIS

¶ 16    On appeal, respondent argues the trial court erred both in finding that she was an unfit person and that termination of her parental rights was in I.A.'s best interest.

¶ 17                              A. Unfitness Finding

¶ 18    In a proceeding to terminate a parent's rights to her minor child, the State must first prove, by clear and convincing evidence, that the parent is an "unfit person" as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). 705 ILCS 405/2-29(2) (West 2018);

*In re M.C.*, 2018 IL App (4th) 180144, ¶ 22, 110 N.E.3d 346. "A reviewing court accords great deference to a trial court's finding of parental unfitness, and such a finding will not be disturbed on appeal unless it is against the manifest weight of the evidence." *M.C.*, 2018 IL App (4th) 180144, ¶ 22. A court's finding that a parent is an unfit person is against the manifest weight of the evidence "only where the opposite conclusion is clearly apparent." (Internal quotation marks omitted.) *In re M.I.*, 2016 IL 120232, ¶ 21, 77 N.E.3d 69.

¶ 19        In the present case, the trial court found respondent was an unfit person on each ground alleged by the State. However, to uphold the court's judgment, we need only determine the State properly established respondent's unfitness on a single ground. See *In re J.H.*, 2020 IL App (4th) 200150, ¶ 74. ("[M]eeting only one of the statutory definitions in section 1(D) of the Adoption Act [citation] is enough to make the parent an 'unfit person[.]' "). Here, the State adequately demonstrated respondent was an unfit person under section 50/1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2018)).

¶ 20        Section 50/1(D)(m)(ii) of the Adoption Act provides a parent may be found to be an unfit person where she fails to "make reasonable progress toward the return of the child to [her] during any 9-month period following the adjudication of neglect[ ] or abuse[ ] *** under Section 2-3 of the Juvenile Court Act of 1987." 750 ILCS 50/1(D)(m)(ii) (West 2018). As we have previously determined, "reasonable progress is an objective standard" which is satisfied when "the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original and internal quotation marks omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88, 19 N.E.3d 227. Reasonable progress is

measured by a parent's "compliance with the service plans and the court's directives in light of the conditions that gave rise to the removal of the child and in light of other conditions that later became known and would prevent the court from returning custody of the child to the parent." *In re Janine M.A.*, 342 Ill. App. 3d 1041, 1051, 796 N.E.2d 1175, 1183 (2003).

¶ 21    Here, the trial court found respondent failed to make reasonable progress toward the return of I.A. from December 17, 2018, to September 19, 2019. The evidence presented at the fitness hearing demonstrated that, during this period, respondent failed to complete any of the directives in her service plan and that any progress respondent made toward completion of the directives was minimal at best. For example, while respondent attended some of her visits with I.A., she failed to attend the majority of them, even when CYFS was paying for her transportation. Additionally, while respondent began participating in some required services, such as substance abuse counseling, her attendance was so sporadic that her provider anticipated she would be unsuccessfully discharged from the program just a few months after she started. Notably, even while respondent was participating in substance abuse counseling, she tested positive for fentanyl and opiates. In light of respondent's failure to make any demonstrable progress toward completion of her service plan, it cannot be said the trial court would have been able to order that I.A. be returned to her in the near future. Accordingly, the court's finding that respondent was an unfit person was not against the manifest weight of the evidence.

¶ 22                    B. Best-Interest Finding

¶ 23    Following a finding of parental unfitness, the trial court "considers the 'best interest' of the child in determining whether parental rights should be terminated." *In re J.L.*, 236 Ill. 2d 329, 337-38, 924 N.E.2d 961, 966 (2010) (quoting 705 ILCS 405/2-93(2) (West 2008)).

Section 1-3 of the Juvenile Court Act of 1987 lists multiple factors the trial court must consider prior to finding termination of a parent's rights is in the minor's best interest. 705 ILCS 405/1-3(4.05) (West 2018). Those factors, which must be considered in the context of the child's age and developmental needs, are: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks associated with substitute care; and (10) the preferences of the persons available to care for the child. *Id.*

¶ 24        On review, "[w]e will not reverse the trial court's best-interest determination unless it was against the manifest weight of the evidence." *In re Jay H.*, 395 Ill. App. 3d 1063, 1071, 918 N.E.2d 284, 291 (2009). The court's decision is against the manifest weight of the evidence "only if the facts clearly demonstrate that the court should have reached the opposite result." *Id.*

¶ 25        The best interest report filed by CYFS indicated I.A. had been in the same foster home for two years as of the date of the best interest hearing. According to the report, I.A. was "thriving" in her foster home, was "loved and appreciated" there, and had "a strong attachment to her foster family." The report also indicated allowing I.A. to remain in the foster home "would provide [her] with the permanency that is necessary to continue her developmental progress and trust in adults." By contrast, the report noted I.A. "ha[d] not interacted with her biological parents for a year and she would not recognize them as a familiar face." Indeed, the evidence showed that, during the last visits respondent had with I.A., I.A. did not show "any signs that she was bonded in any way to [respondent]" and, following the visits, when I.A. returned to her foster family, she

showed "regression signs from her seeing her parents." In light of this evidence, it cannot be said that the trial court's finding that it was in I.A.'s best interest to terminate respondent's parental rights was against the manifest weight of the evidence.

¶ 26                                  III. CONCLUSION

¶ 27          For the reasons stated, we affirm the trial court's judgment.

¶ 28          Affirmed.